## 55363. DOWNS v. THE STATE.

WEBB, Judge.

Ronald Homer Downs and his twin brother Raymond were jointly indicted for the offenses of armed robbery, two counts of aggravated assault and kidnapping. The cases were severed and tried separately. Ronald was tried February 24 through 27, 1976, convicted of all counts except one count of aggravated assault, sentenced to life plus 20 years, and brings this appeal.

The undisputed facts are as follows. On December 22, 1975, the Treasure Island store at Terrell Mill Road and U. S. 41 in Cobb county closed at 10:30 p.m. All doors were locked except one to let late customers out and a security guard was posted there, and sixty percent of the store lights had been turned off. Ronald Brooks, a department manager, was walking toward the rear of the store when he noticed a man wearing a reddish-orange ski mask standing behind a door. The man "put a gun" to his head and forced him to lie down on the floor. Shortly thereafter the masked man told Brooks to walk towards the cash room window.

The store manager, George L. Roberts, was in the cash room. Brooks told him to open the cash room door and when Roberts asked him why, another man wearing a ski mask pointed a gun through the cash room window and told Roberts to open the door. Brooks was forced to lie down on the floor while Roberts opened the safe, and then Roberts was forced to lie on the floor beside Brooks. The two masked men removed the money, alleged to be $65,639.80, from the safe and placed it in a shopping cart. One masked man told Roberts to walk with him and the other had Brooks walk ahead of him. No alarms were

set off.

During this time an assistant manager, Robert Rule, was in an office across the hall from the cash room. Rule heard the conversation between Brooks and Roberts at about 11 p.m., and, his suspicions aroused, telephoned the police to tell them he thought an armed robbery was in progress. He did not see either robber.[1]

Detectives Paul Moore and Ray Richardson were dispatched to the store where they found Detective Kermit Sayre at the front door. Detective Alex Jones arrived almost simultaneously. They approached the security guard who said he was unaware of any problem, but directed Moore and Richardson to the rear of the store where the cash room is located. As they entered the hallway leading to the cash room a man in a "purplish color" mask opened fire, a gun battle ensued and Detective Moore was wounded. Detective Moore thought he might have hit the robber, also. After the exchange of gunfire Man Two dropped two shells in the process of reloading his automatic weapon.

One masked man yelled "grab a shield," Man Two grabbed Roberts and put the automatic pistol under his chin, and Man One grabbed Brooks as a shield. The four men then backed toward double doors leading to the rear of the store. As they exited the double doors the police fired a shotgun at them. Roberts opened a rear fire door and both robbers left the store. Sgt. Jones followed the two men to the rear of the store, and out the back door, and went to his police car where he broadcast a description at approximately 11:30 p.m. Man One, subsequently identified as Ronald Downs, was described as being six feet tall, dressed in a brown mustard or tan colored leisure suit with a brown shirt, wearing tan soft shoes and a wine-colored ski mask and carrying a large caliber revolver. Man Two was described as a white male approximately six feet tall, dressed in a three-quarter length dark coat

---

[1] During the trial the robbers were referred to as "Man One" and "Man Two" and, for clarity, we will adopt this denomination. The state contended that Man One was Ronald Downs and Man Two was Raymond Downs.

with blue jeans, wearing a black ski mask and armed with an automatic pistol. Sgt. Jones identified state's exhibit 6, the clothing taken from Ronald Downs and admitted by him to be his, as being that worn by the robber in the wine-colored ski mask.

During the next hour and a half six people were detained by the police pursuant to these descriptions. However, after Sgt. Jones looked at them they were released. Between 1 and 1:30 a.m., having received a complaint from a resident of the Fernlake Apartments on Terrell Mill Road near Treasure Island about noises in a vacant apartment overhead, officers of the Marietta and Cobb County police responded to the call. Officer Long of the Marietta Police Department and Sgt. Toler of Cobb County found Ronald Downs in the vacant apartment, clothed in wet, damp clothing, which was covered with mud, foliage and other debris similar to that of the police officers who had been in the wooded area between Treasure Island and the Fernlake Apartments where the robbers had fled. Sgt. Toler identified photographs of Ronald Downs taken at the time of his arrest as true and accurate depictions.

Ronald complained that he thought his shoulder was broken and was transported to Kennestone Hospital where he was searched by Officer Harry Kyle of the Marietta police. Officer Kyle found six empty bullet casings, four .357 magnum and two .38 caliber shells. All these casings, except for one which had a bent rim, fit into state's exhibit 8, a .357 magnum Luger revolver which was found on December 29 in the woods behind Treasure Island[2] and identified as having been sold to Raymond by a friend, Steiner Moore. Test cartridges fired from the .357 Luger by Kelly Fite of the state crime lab were identical as to firing pin and weapon breech comparisons. In Mr. Fite's

---

[2] When found, the six-shot revolver had four empty shells in it, which was consistent with the testimony of Ronald Brooks that Man One in reloading was so nervous that he dropped two bullets on the floor. The butt of the pistol, where the serial number would be located, was cut off.

opinion, the six cartridges taken from Ronald's pocket "were fired in state's exhibit 8 and no other weapon." The defense firearms expert also reached the same conclusion.

Ronald testified that on December 22 he spent the day at Raymond's house working on a truck. He went home at 5:30 p.m. and returned about 8:30 p.m. He and Raymond went to K-Mart to get some anti-freeze and some parts for a truck. At 9 or 9:30 p.m. he and Raymond had an argument at K-Mart and Raymond drove away, leaving him there. Thinking Raymond would return he waited at K-Mart for five or ten minutes, then walked across the street to Sears at a few minutes to ten. He looked around, killing time until he could call his wife who was out Christmas shopping, to come pick him up. When he was unable to reach his wife he walked to a nearby Wendy's, then decided to walk home while trying to contact his wife. Still failing to reach his wife, he hitched a ride with a young male driving a brown Pontiac, whom he subsequently has been unable to locate.

Ronald was let out of the car at Terrell Mill Road and walked to a nearby apartment complex where a friend lived to use the telephone. He noticed numerous police cars in the vicinity. Not knowing the number of his friend's apartment he began looking for his name on the mail boxes in the inside corridor of one of the units. Not finding it he walked outside and was approached by two men. One was helping his companion, who appeared to be drinking. As he walked past them, one of the men grabbed him and demanded his car. When he told them he had no car he was struck in the back of the head by one of the men. Thinking his arm was broken, and in a state of semi-shock, he wandered into one of the vacant apartment units looking for a telephone. Within a few minutes the police arrived and arrested him. He was searched and transported to Kennestone Hospital. At Kennestone he was searched again and a police officer reached in his pocket, pulled out some shells and threw them on the table. He had no idea where the shells came from, had never seen them before and had never owned a gun.

1. It is contended that the trial court erred in overruling appellant's motion pursuant to Brady v.

Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), to disclose the whereabouts of a tape recording of the description broadcast by Sgt. Alex Jones of the men alleged to have perpetrated the robbery, because "the issue of identity was vital in this case." We do not agree.

It appears that it was the policy of the police to routinely "recycle" these radio dispatches every 60 days and that the tape was not available to the district attorney when the request was made. While identity was an important issue, Sgt. Jones was only one of several witnesses at the trial to describe the robbers and their clothing, and "The appellant has the burden of showing how his case has been materially prejudiced, even when the trial court declines to make an in camera inspection." *Hicks v. State,* 232 Ga. 393, 396 (207 SE2d 30) (1974); *Pless v. State,* 142 Ga. App. 594, 595 (2) (236 SE2d 842) (1977). See also *Foote v. State,* 141 Ga. App. 18 (2) (232 SE2d 366) (1977). We find no abuse of discretion here.

2. The assertion that the trial court erred in refusing to direct a verdict of acquittal is without merit. The evidence was in conflict, thereby precluding the direction of a verdict as a matter of law, and at no point in the trial was such a motion made. There being evidence to support the verdict, it must be affirmed. *Ridley v. State,* 236 Ga. 147, 148 (1) (223 SE2d 131) (1976); *Paul v. State,* 144 Ga. App. 106 (240 SE2d 600) (1977).

3. Admission of testimony of Steiner Moore and his wife as to activities of Raymond Downs subsequent to the arrest of Ronald Downs is protested on the grounds that no prima facie conspiracy was shown; that if shown, any conspiracy was terminated with Ronald's arrest; and that thus all conversations with Raymond were hearsay. Although other objections on various grounds were made to this testimony at the trial, at no time was any objection raised that the state was attempting to elicit information from either witness without first establishing a prima facie case of conspiracy. "A reason why evidence should not be admitted will not be considered on appeal unless the reason was urged below." *Employers Commercial Union Ins. Co. v. Wrenn,* 132 Ga. App. 287, 288 (1) (208 SE2d 124) (1974); *Redwing Carriers, Inc. v. Knight,* 143 Ga. App. 668, 671 (3) (239 SE2d 686) (1977).

4. Steiner and Helen Moore were friends of the Downs brothers and provided aid to Raymond after the robbery. In order to have them testify about the Luger revolver sold to Raymond, and used by Ronald in the robbery, it was necessary for the state to grant them immunity. It is clear from the transcript that they were reluctant witnesses, and that the trial court properly exercised its discretion in allowing the state to ask leading questions in accordance with Code § 38-1706. *Sherrell v. State,* 41 Ga. App. 502, 503 (4) (233 SE2d 869) (1977). Enumeration 5 is not meritorious.

5. Ronald asserts that the district attorney was improperly allowed to question him on his failure to report to the police that he was assaulted outside the Fernlake Apartments on the night of the robbery. Again, no objections of any kind were made to these remarks and he cannot complain now for the first time on appeal. *Crowder v. State,* 233 Ga. 789, 790 (3) (213 SE2d 620) (1975).

*Judgment affirmed. Quillian, P. J., and McMurray, J., concur.*

SUBMITTED FEBRUARY 7, 1978 — DECIDED APRIL 5, 1978.

*Dupree & Staples, Hylton B. Dupree, Jr., David S. Marotte,* for appellant.

*Thomas J. Charron, District Attorney, Adele Grubbs, Assistant District Attorney, Richard L. Moore, Special Assistant District Attorney,* for appellee.